UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JESUS CARDENAS MEDINA, *et al.*,

               Petitioners,

    v.

JULIO HERNANDEZ, *et al.*,

               Respondents.

Case No. C26-1523-SKV

ORDER GRANTING IN PART WRIT
OF HABEAS CORPUS

       Petitioners Jesus Cardenas Medina, Jose Lopez Palacios, Edwin Marcano Marquez, Ronald Ramirez Buelvas, and Mohamed Sacko are currently detained by U.S. Immigration and Customs Enforcement ("ICE") at the Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington.  They jointly filed this 28 U.S.C. § 2241 habeas action through counsel to obtain release from immigration detention, arguing that their respective re-detentions after having been conditionally released into the United States violate their due process rights under the Fifth Amendment.  *See generally* Dkt. 1.  Each Petitioner provided a sworn declaration in support. *See* Dkts. 2-6.  Government Respondents filed a timely return (Dkt. 10), along with a sworn declaration from U.S. Department of Homeland Security ("DHS") Deportation Officer Ian Bloom (Dkt. 11) ("Bloom Decl.") and an unsworn declaration from their counsel Michelle

ORDER GRANTING IN PART WRIT OF HABEAS
CORPUS - 1

Lambert (Dkt. 12) ("Lambert Decl."). Petitioners filed a timely traverse in reply (Dkt. 13), along with a sworn declaration from one of their attorneys of record, Kevin Hollinz (Dkt. 14) ("Hollinz Decl.").

Having considered the parties' submissions, the balance of the record, and the governing law, the Court GRANTS in part the petition (Dkt. 1) and ORDERS that Petitioners be released from detention within twenty-four (24) hours. Remaining requests for relief are addressed below.

## I.   BACKGROUND

The facts specific to each Petitioner are set forth below. Common among all Petitioners is that they are noncitizens who were previously detained and released from immigration custody and, after living in the United States for a significant period, were re-detained by immigration officials without first receiving notice or an opportunity to be heard on the reasons for their re-detentions. *See generally* Dkts. 2-6; *see also* Dkt. 10 at 1, 8.

### A.   Petitioner Jesus Cardenas Medina

Jesus Cardenas Medina ("Cardenas Medina") is a native and citizen of Venezuela, who first entered the United States on or about September 28, 2023. Dkt. 2 ("Cardenas Medina Decl."), ¶¶ 1-2. Cardenas Medina asserts that he left Venezuela because he was being threatened and extorted. *Id.* ¶ 1. He was apprehended by U.S. Customs and Border Protection ("CBP") and thereafter detained in Texas for approximately one month. *Id.* ¶ 2.

On October 31, 2023, Cardenas Medina was paroled into the United States and required to report to ICE pursuant to an Alternatives to Detention ("ATD") Program. Bloom Decl., ¶ 9; *see* Lambert Decl., ¶ 2, Ex. A. Cardenas Medina asserts that he was provided with a cell phone at the time of his release and instructed to submit a picture every Thursday for two months.

Cardenas Medina Decl., ¶ 3. He was also scheduled to attend an immigration court hearing on February 10, 2027, in Memphis, Tennessee. *Id.* After his release, Cardenas Medina lived with his cousin in Kentucky and continued sending weekly pictures. *Id.* ¶ 4. After two months, he was instructed to turn his phone into the local Intensive Supervision Appearance Program ("ISAP") office, but the agent was not present to accept his phone. *Id.* Cardenas Medina asserts that he sent multiple emails to the ISAP office explaining that he had tried to comply, but contends that he never received a response or further instruction from ISAP regarding his supervision. *Id.*

While on release, Cardenas Medina applied for asylum and was granted work authorization. *Id.* ¶ 6. Cardenas Medina moved to Seattle in August 2025 and filed a change of address with ICE. *Id.* ¶ 7. He sought the advice of his immigration lawyer regarding his address change and whether he should notify the Tennessee immigration court, but asserts his attorney advised it was not necessary and that his attorney could attend future hearings on his behalf. *Id.* Despite his attorney's advice, Cardenas Medina contends he planned to attend his 2027 immigration hearing in Tennessee. *Id.*

In September 2025, Cardenas Medina reported to the Tukwila, Washington ISAP office for an appointment, during which ICE took back his government-provided phone and installed an application on his personal phone. *Id.* ¶ 8. Thereafter, he was required to send weekly photos and attend monthly check-ins. *Id.* ¶ 9. He asserts that he would sometimes receive "error" messages or have difficulty uploading his image, but states that he never missed a check-in or failed to send a photo. *Id.* ¶¶ 9-10.

On April 22, 2026, Cardenas Medina reported to his biometric appointment in Tukwila, Washington, at which ICE Enforcement and Removal Operations ("ERO") advised him of

"seven missed photo check-ins and another violation with ICE." *Id.* ¶ 11.  Cardenas Medina asserts he was informed by ICE that one of the violations was due to his failure to update his address with the Tennessee immigration court. *Id.*  Despite Cardenas Medina contending he never missed a check-in, Officer Bloom states that "records available to DHS" document that Cardenas Medina missed multiple biometric check-ins between November 2024 and October 2025, in violation of the terms of his ATD program.[1]  Bloom Decl., ¶ 12.

Officer Bloom further states that "ERO management approved a custody redetermination" based on his Order of Recognizance ("OREC") violations. *Id.*  He was taken into custody and transferred to the NWIPC, where he remains detained. *Id.*

**B.      Petitioner Jose Lopez Palacios**

Petitioner Jose Lopez Palacios ("Lopez Palacios") is a native and citizen of El Salvador, who first entered the United States as a minor on or about October 11, 2022.  Dkt. 3 ("Lopez Palacios Decl."), ¶¶ 1-2; Bloom Decl., ¶¶ 15-16.  Lopez Palacios states that he fled El Salvador because he was facing political persecution.  Lopez Palacios Decl., ¶ 1.  Because he was an unaccompanied minor, he was transferred to the Office of Refugee Resettlement ("ORR") and later released on November 16, 2022, to a sponsor.  Bloom Decl., ¶¶ 17-18.  Lopez Palacios states he moved to Spokane, Washington to live with his uncle.  Lopez Palacios Decl., ¶ 3.

While on release, Lopez Palacios filed for asylum and was issued a work permit and Social Security number as part of his asylum application. *Id.* ¶ 5.  His petition for Special Immigration Juvenile ("SIJ") status was approved in April 2024, and he was granted deferred action. *Id.* ¶ 6.

---

[1] Respondents did not include a copy of Cardenas Medina's order of release, the terms of his ATD program, or the DHS records purportedly documenting the violations in their return memorandum or pleadings in support.

ORDER GRANTING IN PART WRIT OF HABEAS
CORPUS - 4

Lopez Palacios asserts he began attending monthly in-person ICE appointments starting in February 2023. *Id.* ¶ 7. Officer Bloom states that Lopez Palacios enrolled in an ATD program on January 29, 2024.[2] Bloom Decl., ¶ 19.

Lopez Palacios asserts that in July 2025, his check-in requirement changed to every three months. Lopez Palacios Decl., ¶ 7. As part of his asylum application, Lopez Palacios states that he was also required to complete weekly check-ins through the ISAP program. *Id.* Every Wednesday, he would take and submit a picture through the ISAP application. *Id.*

Lopez Palacios traveled to Los Angeles in November 2025 to see his sick and hospitalized mother. *Id.* ¶ 8. While in Los Angeles, he completed his ISAP check-ins on November 19, November 26, and December 3. *Id.* After his December 3 check-in, he received a message on his ISAP application notifying him that "authorities knew he was not in Spokane." *Id.* ¶ 9. He was thereafter locked out of the ISAP application, preventing him from reading any messages or checking his calendar for appointments. *Id.* Lopez Palacios states that because all communication with ISAP was through the phone application, he did not have a way to reach ISAP or one of their representatives while locked out of the application. *Id.* ¶ 10. Lopez Palacios asserts he consistently complied with his ISAP program and was never told he could not leave Washington State. *Id.* ¶ 7.

Lopez Palacios acknowledges that he missed his weekly photo check-ins after December 3, 2026, because of the application lock-out. *Id.* ¶ 11. Lopez Palacios asserts he had scheduled his return flight from Los Angeles for January 8, 2026, and planned his travel around his immigration obligations so that he would be able to attend his in-person check-in scheduled for January 16, 2026. *Id.*

---

[2] Respondents do not provide any documents related to Lopez Palacios' ATD enrollment.

ORDER GRANTING IN PART WRIT OF HABEAS
CORPUS - 5

Lopez Palacios states that he attended his January 16, 2026, appointment as instructed. *Id.* ¶ 13. After checking in, the man who greeted him came back with three ICE officers, who told him he was being arrested for missing his photo check-ins and leaving Washington State. *Id.* Lopez Palacios asserts that he attempted to explain the situation and that he had a pending asylum application, but the officers were not receptive. *Id.* He contends that, prior to his appointment, he was not provided notice that he was going to be detained. *Id.* He was handcuffed and eventually transferred from Spokane to the NWIPC. *Id.* ¶¶ 13-14.

On January 20, 2026, Lopez Palacios was issued a Notice to Appear, charging him with inadmissibility under the Immigration and Nationality Act ("INA"). Bloom Decl., ¶ 24. DHS has agreed to continue Lopez Palacios' immigration case to "allow him to pursue a pending application with USCIS." *Id.* ¶ 25.

Officer Bloom's declaration provides little detail about Lopez Palacios' release and his alleged violations. He asserts that Lopez Palacios had an ATD violation on November 21, 2024, that "may have been connected to equipment failure." *Id.* ¶ 20. Lopez Palacios was "un-enrolled from ATD on November 27, 2024, and reenrolled on February 28, 2025." *Id.* Officer Bloom states that Lopez Palacios had several additional ATD violations between September 2025 and December 2025, including missed biometric check-ins, check-ins outside the permitted geographical area, and a missed office visit. *Id.* ¶ 21. Officer Bloom asserts that ICE revoked his ATD due to these violations. *Id.* ¶ 22.

### C.    Petitioner Edwin Marcano Marquez

Petitioner Edwin Marcano Marquez ("Marcano Marquez") is a native and citizen of Venezuela, who first entered the United States on or about January 12, 2022. Bloom Decl., ¶¶ 28-29. Marcano Marquez asserts he fled Venezuela because his political party opposed the

ORDER GRANTING IN PART WRIT OF HABEAS
CORPUS - 6

Venezuelan government and because he had been threatened and harmed by "government-controlled colectivos." Dkt. 4 ("Marcano Marquez Decl."), ¶ 1.

He was detained by CBP and expressed a fear of returning to Venezuela. *Id.* ¶ 2. After approximately two weeks, he was issued an NTA and released on an OREC. *Id.*; Bloom Decl., ¶¶ 30-32. On March 14, 2022, after arriving in Portland, Oregon, Marcano Marquez reported to the local ERO office and was placed on an ATD program. Marcano Marquez Decl., ¶ 3; Bloom Decl., ¶ 33. Marcano Marquez asserts that ICE installed an application on his phone, and he was required to take weekly photos and be present for in-home check-in calls. Marcano Marquez Decl., ¶ 3. He asserts that he complied with the requirements up until his criminal arrest. *Id.*

On December 26, 2022, Marcano Marquez was arrested for "Felony Strangulation, Misdemeanor Assault in the Fourth Degree Constituting Domestic Violence, and Misdemeanor Harassment" in Washington County, Oregon. *Id.* ¶ 4; Bloom Decl., ¶ 35. On May 26, 2023, Marcano Marquez pled guilty to Assault in the Fourth Degree and was sentenced to two years of probation. Marcano Marquez Decl., ¶ 4; Bloom Decl., ¶ 37. The remaining charges were dismissed. *See* Lambert Decl., ¶ 4, Ex E at 3.

Marcano Marquez asserts that he attempted to contact ICE after his arrest. Marcano Marquez Decl., ¶ 5. He also tried to log into the ATD application on his phone, but his credentials were not accepted. *Id*. He called his case manager, who informed him to wait until he was contacted by ICE. *Id*. Marcano Marquez asserts he was never contacted by ICE, so he tried (unsuccessfully) to call his case manager again. *Id.* ¶ 6. He went to the Portland ICE office, but it was closed, and he was unable to speak with anyone. *Id.*

Marcano Marquez states that he pursued his asylum case while he waited for ICE to contact him. *Id.* ¶ 7. He submitted his asylum application in January 2023 and attended his first

hearing on April 10, 2023.  *Id.*  He attended a scheduled biometrics appointment on June 30, 2023.  *Id.*  He applied for employment authorization.  *Id.*  While his employment authorization application was pending, he received and complied with a "request for evidence" related to his criminal case.  *Id.*  His employment authorization was granted in September 2024, which remains valid until September 2029.  *Id.*

After finishing probation and the other requirements related to his criminal case, Marcano Marquez continued living and working in Beaverton, Oregon.  *Id.* ¶ 8.

Having never been contacted by ICE, Marcano Marquez accompanied his brother to his brother's ICE check-in appointment, hoping to speak with someone about his own case.  *Id.* ¶ 9. He was informed that staff would not speak with him unless he was attending his own appointment.  *Id.*

Marcano Marquez asserts that on November 28, 2025, he was pulled over by immigration officers.  *Id.* ¶ 10.  After providing his information to officers, he was informed that he was being detained because of his past criminal charge.  *Id.*  He asserts his request to speak with a lawyer was denied.  *Id.*  He was arrested and transferred to the NWIPC.  *Id.*

Officer Bloom states that ICE arrested Marcano Marquez during a "targeted immigration enforcement" operation after "encounter[ing] a vehicle registered to [him]."  Bloom Decl., ¶ 39. Officer Bloom asserts that DHS records do not show that Marcano Marquez had contact with or made any attempt to contact ICE between May 2023 and November 2025.  *Id.* ¶ 38.

On February 9, 2026, an immigration judge ordered Marcano Marquez removed to Venezuela.  *Id.* ¶ 40.  On March 6, 2026, Marcano Marquez appealed the removal order to the Board of Immigration Appeals ("BIA"), which remains pending.  *Id.* ¶ 41.

//

ORDER GRANTING IN PART WRIT OF HABEAS
CORPUS - 8

**D.    Petitioner Ronald Ramirez Buelvas**

Petitioner Ronald Ramirez Buelvas ("Ramirez Buelvas") is a native and citizen of Venezuela, who first entered the United States on December 31, 2024, at the Brownsville, Texas Port of Entry. Bloom Decl., ¶¶ 43-44. Ramirez Buelvas asserts he left Venezuela because he feared police would harm him for failing to comply with their demands for money. Dkt. 5 ("Ramirez Buelvas Decl."), ¶ 1. Ramirez Buelvas asserts he had an appointment for a "CBP One" application at the Port of Entry, during which he was photographed, fingerprinted, and instructed to attend a court hearing in Atlanta, Georgia in May 2028. *Id.* ¶ 2. He does not recall receiving any further instructions or being required to check in with ICE in Atlanta prior to his May 2028 hearing. *Id.*

Officer Bloom asserts that Ramirez Buelvas did not possess sufficient documents for lawful entry during his December 31, 2024, CBP One appointment. Bloom Decl., ¶ 44. Officer Bloom further states that Ramirez Buelvas was issued an NTA and paroled into the United States on December 31, 2024.[3] *Id.* ¶¶ 45-46.

Following his release, Ramirez Buelvas filed for asylum in May 2025. Ramirez Buelvas Decl., ¶ 3. He also applied for and was granted work authorization in November 2025. *Id.*

Ramirez Buelvas traveled to Anchorage, Alaska on March 29, 2026, to visit his cousin. *Id.* ¶ 4. On April 10, 2026, ICE officers approached him after his cousin parked his car. *Id.* They asked for his identification, and he explained he was visiting from Atlanta. *Id.* ICE told him that he had violated his release for failing to update his address. *Id.* He was arrested and driven to an office, where he was questioned, photographed, and fingerprinted. *Id.* ¶ 6. He was

---

[3] Respondents do not provide any documents related to Ramirez Buelvas' parole.

ORDER GRANTING IN PART WRIT OF HABEAS
CORPUS - 9

held in a detention center in Alaska for several days and eventually transferred to the NWIPC. *Id.* ¶ 7.

Ramirez Buelvas asserts that he did not move to Alaska and was expected to return to his job in Atlanta on April 13, 2026. *Id.* ¶ 5. He asserts he does not have any criminal history. *Id.* ¶ 8.

Officer Bloom states that ERO officers arrested Ramirez Buelvas in Anchorage, Alaska while "performing surveillance to detain a known criminal [noncitizen]." Bloom Decl., ¶ 47. Bloom contends that, based on "further checks," officers determined Ramirez Buelvas was living and working in Anchorage. *Id.* He was taken into custody for a "custody redetermination" and transferred to the NWIPC. *Id.* ¶¶ 48-49. Officer Bloom does not explain whether ICE was specifically targeting Ramirez Buelvas, why ICE arrested Ramirez Buelvas, or why he was processed for a custody redetermination. Ramirez Buelvas was scheduled for a final hearing on his application for relief from removal on May 20, 2026. *Id.* ¶ 49.

**E.      Petitioner Mohamed Sacko**

Petitioner Mohamed Sacko ("Sacko") is a citizen of Guinea who first entered the United States on December 31, 2023, near Lukeville, Arizona. Dkt. 6 ("Sacko Decl."), ¶¶ 1-2; Bloom Decl., ¶ 51. Sacko asserts that he left Guinea over his political opinion in opposition of the military government. Sacko Decl., ¶ 1. He was detained by CBP and expressed fear of returning to Guinea. *Id.* ¶ 2. He was thereafter released with an NTA requiring him to report to the Portland, Oregon ICE office upon his arrival. *Id.*

Sacko lived with his uncle in Portland and made an appointment with the local ICE office. *Id.* ¶ 3. He was ordered to report to the ISAP office in Portland, where they installed an

ORDER GRANTING IN PART WRIT OF HABEAS
CORPUS - 10

application on his phone and ordered him to send weekly photographs and attend monthly ISAP check-ins.[4]  *Id.*; Bloom Decl., ¶ 54.

Sacko states that his ISAP appointments were not set in advance, but he would instead receive a phone call scheduling him to check-in the following day.  Sacko Decl., ¶ 3.  Sacko asserts he never missed an in-person check-in appointment.  *Id.*  He acknowledges two occasions where he was late sending in his weekly photograph but was never informed by ISAP that there was a problem with his compliance.  *Id.*  Sacko asserts that in November or December 2025, his ISAP officer reduced the frequency of his appointments based on his compliance.  *Id.*

While living in Portland, Sacko hired an attorney to assist with his asylum application. *Id.* ¶ 4.  He received employment authorization in 2025.  *Id.*  He found a job at Amazon, continued living with his uncle, and joined a community service organization in Portland.  *Id.* ¶¶ 4-5.  Sacko asserts that his first immigration hearing was scheduled for March 2026.  *Id.* ¶ 4.

Sacko contends that he has no criminal history and that his criminal arrest that ultimately led to his re-detention was made in error.  *Id.* ¶ 6.  In October 2025, he called 911 to report that his car had been stolen while it was parked outside his uncle's house.  *Id.*  The next day, an officer called to inform him that his vehicle had been involved in a collision.  *Id.*  The officer gave him the name of the tow company and he subsequently retrieved his vehicle.  *Id.*  A few weeks later, he was arrested on his way to work and was criminally charged for the accident.  *Id.* At the first hearing, the judge informed him that he was free to leave because charges had not been filed.  *Id.* ¶ 7.

The same day the case was dismissed, his ISAP officer called him regarding his arrest. *Id.* ¶ 8.  He was instructed to come into the ISAP office the next day to talk about the arrest.  *Id.*

---

[4] Respondents included a copy of Sacko's order of release, but the box indicating enrollment in an ATD program is not checked.  *See* Lambert Decl., ¶ 5, Ex. I at 1.

He was placed on an ankle monitor, which ICE agreed to remove once ICE received dismissal paperwork from the court. *Id.* Sacko eventually provided dismissal paperwork to ISAP using his phone's application. *Id.* ¶ 9.

On January 4, 2026, Sacko woke up to four ICE officers in his bedroom. *Id.* ¶ 10. He was arrested and told he needed to go to the ICE office. *Id.* Sacko contends that he was not provided with any paperwork or given a chance to ask questions. *Id.* Once at the ICE office, he was told his arrest was related to his contact with law enforcement. *Id.* He attempted to explain that he was the victim of a crime, but Sacko asserts that officers were not receptive. *Id.*

Officer Bloom states that ERO terminated Sacko's enrollment from ATD due to ISAP violations and his Multnomah County arrest. Bloom Decl., ¶ 56. Officer Bloom does not provide further details regarding the alleged ATD violations or respond to Sacko's contention that he was the victim of a crime, that his arrest was made in error, or that criminal charges were not filed.

On February 17, 2026, Sacko attended an immigration hearing, at which the immigration judge pretermitted Sacko's asylum application and ordered his removal to Uganda. *Id.* ¶ 59. On March 17, 2026, Sacko appealed his order of removal to the BIA, which remains pending. *Id.* ¶ 60.

**F.      Petition for Relief**

On May 5, 2026, Petitioners jointly filed the instant petition for writ of habeas corpus challenging their re-detentions and seeking release from custody. They also seek injunctive relief related to future re-detention. *See* Dkt. 1 at 28-29.

//

//

ORDER GRANTING IN PART WRIT OF HABEAS
CORPUS - 12

## II.    LEGAL STANDARDS

Federal courts have authority to grant writs of habeas corpus to individuals detained in "violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3); *Yildirim v. Hermosillo*, No. C25-2696-KKE, 2026 WL 111358, at *1 (W.D. Wash. Jan. 15, 2026).  "In habeas cases, federal courts have broad discretion in conditioning a judgment granting relief," and may dispose of habeas matters "as law and justice require."  *Lujan v. Garcia*, 734 F.3d 917, 933 (9th Cir. 2013); 28 U.S.C. § 2243.

## III.    DISCUSSION

It is undisputed that Petitioners did not receive pre-deprivation notice or an opportunity to be heard on the basis for their respective re-detentions.  Dkt. 10 at 1 ("There is no dispute that immigration officials re-detained Petitioners without pre-deprivation hearings.").  Petitioners contend that, under *Mathews*,[5] receiving no pre-deprivation process after being conditionally released violated their rights under the Fifth Amendment.  Dkt. 1 at 22-24.  Respondents agree this case is appropriately assessed under the *Mathews* framework but disagree on whether it affords relief as to all Petitioners.  *See* Dkt. 10 at 8-10.

Respondents do concede that, on these facts, courts in this District have found noncitizen habeas petitioners similarly situated to Petitioners Cardenas Medina, Lopez Palacios, and Ramirez Buelvas to be entitled to pre-deprivation hearings.  *See* Dkt. 10 at 9 (and the Western District of Washington cases cited therein).  As for Petitioners Marcano Marquez and Sacko, Respondents contend that their release from detention would be improper because their criminal arrests while on release constituted material changes in their circumstances.  *Id.* at 9.

---

[5] *Mathews v. Eldridge*, 424 U.S. 319 (1976).

ORDER GRANTING IN PART WRIT OF HABEAS
CORPUS - 13

Accordingly, Respondents argue that any relief provided to Marcano Marquez and Sacko should consist of a post-deprivation hearing to reassess their dangerousness or risk of flight. *Id.* at 9-10.

### A.    Detention Authority

As an initial matter, the Court rejects Respondents' statutory argument that 8 U.S.C. § 1225(b) operates to mandate Petitioners' detention because they are "applicants for admission" who are "seeking admission" into the United States. *See* Dkt. 10 at 1, 3-5. This oft-rejected argument relies on out-of-circuit authority that is not binding on this Court. Moreover, despite acknowledging that a particular noncitizen's circumstances "drive what process is due" (*see* Dkt. 10 at 2), Respondents do not discuss each Petitioner's individual circumstances to explain why their detention is mandatory under § 1225(b). *See id.* at 3-5. Instead, Respondents point to an internal DHS memorandum that memorializes the Department's recent change in position on detention and release authorities, and summarily conclude that each Petitioner here is subject to mandatory detention under 8 U.S.C. § 1225(b). *Id.* at 5. Respondents did not provide the DHS memorandum for the Court's review here but chose instead to cite excerpts of the memo from the opinion in *Rodriguez v. Bostock*, 802 F. Supp. 3d 1297, 1308 (W.D. Wash. 2025), a case from this District that has considered and rejected the same argument Respondents advance here. *Id.*; *see Rodriguez*, 802 F. Supp. 3d at 1304 n.3 (W.D. Wash. 2025) (collecting cases). Respondents offer no reason for this Court to deviate from the reasoning articulated in *Rodriguez* and it declines to do so here.

Regardless, Petitioners are not challenging the statutory basis of their re-detentions. Rather, their claim is that the Fifth Amendment entitled them to some amount of process *before* ICE arrested and re-detained them. *See* Dkt. 1 at 21-24. Their claims are therefore constitutional, not statutory. *See P.T. v. Hermosillo*, C25-2249-KKE, 2025 WL 3294988, at *2

ORDER GRANTING IN PART WRIT OF HABEAS
CORPUS - 14

n.1 (W.D. Wash. Nov. 26, 2025) ("To the extent that the Government's briefing suggests that [§] 1225(b) should be the beginning and end of the Court's inquiry, this position is emphatically rejected."); *Francois v. Wamsley*, C25-2122-RSM, 2025 WL 3063251, at *3 (W.D. Wash. Nov. 3, 2025) ("Any argument that ICE acted within its authority has no [effect] on a claim contending that detention violates Constitutional Due Process.").

Accordingly, to the extent Respondents argue that § 1225(b) justifies Petitioners' detentions or otherwise comports with due process, that argument is, without more, rejected. "[T]he fact that the Government may believe it has a valid reason to detain Petitioner does not eliminate its obligation to effectuate the detention in a manner that comports with due process." *Ramirez Tesara v. Wamsley*, 800 F. Supp. 3d 1130, 1137 (W.D. Wash. 2025). The Court now turns to Petitioners' due process claim and applies the *Mathews* framework.

**B.      *Mathews* and Due Process**

The Fifth Amendment forbids the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. V. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 522 (1965)). Due process is "flexible and calls for such procedural protections as the particular situation demands." *Id.* at 334 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). It "applies to all 'persons' within the United States, including [noncitizens], whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) (internal citations omitted).

//

//

ORDER GRANTING IN PART WRIT OF HABEAS CORPUS - 15

The Supreme Court, in *Mathews*, established a three-part test for determining whether a particular government action comports with due process. The *Mathews* test balances the following factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.

In *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1211 (9th Cir. 2022), the Ninth Circuit assumed without deciding that the *Mathews* test applies in the immigration detention context and courts in this District employ the framework in cases challenging re-detention under circumstances like Petitioners' here. *See E.A. T.-B. v. Wamsley*, 795 F. Supp. 3d 1316, 1321 n.4 (W.D. Wash. 2025) (collecting cases employing the *Mathews* factors in similar immigration contexts).

### 1.    Private Interest

Petitioners have a constitutionally protected interest in their continued liberty. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690. When Petitioners were released from immigration custody shortly after entering the United States, they acquired a liberty interest protected by the Due Process Clause. *See Doe v. Becerra*, 787 F. Supp. 3d 1083, 1093 (E.D. Cal. 2025) ("The Supreme Court has repeatedly recognized that individuals who have been released from custody, even where such release is conditional, have a liberty interest in their continued liberty.").

ORDER GRANTING IN PART WRIT OF HABEAS
CORPUS - 16

Here, each Petitioner had been conditionally released after their brief initial detention at the border. They spent the vast majority of their time in the United States out of custody, establishing connections in reasonable reliance on their continued freedom. Cardenas Medina filed for asylum, obtained employment authorization, and established a community of friends and family in the Seattle area. Cardenas Medina Decl., ¶¶ 6-7, 15. Lopez Palacios filed for asylum, obtained employment authorization, and was granted deferred action based on his SIJ approval. Lopez Palacios Decl., ¶¶ 5-6, 16. Marcano Marquez filed for asylum, obtained employment authorization, and lived in Beaverton with his partner and his brother. Marcano Marques Decl., ¶¶ 7, 13. Ramirez Buelvas filed for asylum, obtained work authorization, and worked full-time in Atlanta to support himself. Ramirez Buelvas Decl., ¶¶ 3, 9. Sacko filed for asylum, obtained work authorization, and joined a community service organization. Sacko Decl., ¶¶ 4-5. "[Noncitizens] who have established connections in this country have due process rights in deportation proceedings[.]" *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 107 (2020). Respondents do not suggest otherwise. Accordingly, the first *Mathews* factor weighs in Petitioners' favor.

        *2.      The Risk of Erroneous Deprivation and Value of Additional Safeguards*

Providing effectively no pre-deprivation process prior to arresting and re-detaining Petitioners created a high risk of erroneous deprivation of their liberty. Respondents concede that Petitioners were not provided notice prior to their arrests and that, consistent with prior decisions in this District, Petitioners Cardenas Medina, Lopez Palacios, and Ramirez Buelvas were entitled to pre-deprivation hearings. Dkt. 10 at 9. The Court finds that the circumstances of Marcano Marquez and Sacko's re-detentions demonstrate that they were similarly entitled to

pre-deprivation process and that such process would have reduced the risk of an erroneous deprivation of liberty.

When ICE released Petitioners after their initial detentions, it did so after determining—as required by regulation—that "such release would not pose a danger to property or persons, and that the [noncitizen] is likely to appear for any future proceeding." 8 C.F.R. §§ 212.5(b), 236.1(c)(8). Courts in this District have found that arresting and detaining noncitizens who were initially detained and released without first reconsidering those factors poses a significant risk of erroneous deprivation. *See, e.g., E.A. T.-B.*, 795. F. Supp. 3d at 1323; *Ledesma Gonzalez v. Bostock*, 808 F. Supp. 3d 1189, 1202-03 (W.D. Wash. 2025). Here, each Petitioner was conditionally released, demonstrated a history of compliance with those conditions, but were nevertheless arrested based on vague violations that are either largely unexplained here or difficult to support with the scant evidentiary record.

Further, the limited contemporaneous documentation and Officer Bloom's lack of first-hand knowledge only serve to emphasize the value that additional safeguards would have provided. For example, Cardenas Medina is alleged to have missed biometric check-ins as ordered by his OREC, but Respondents did not provide a copy of the OREC or articulate its conditions. Officer Bloom does not provide additional explanation, such as how the violations were discovered and by whom. The limited documentation from Cardenas Medina's immigration file notes several dates of missed check-ins, but it appears those dates were entered after the alleged violations were discovered during a "routine case review." *See* Lambert Decl., ¶ 2, Ex. B at 2-3. The fact that Officer Bloom concedes that part of Cardenas Medina's administrative file contains errors (*see* Bloom Decl., ¶ 13) calls the accuracy of those records into question.

ORDER GRANTING IN PART WRIT OF HABEAS
CORPUS - 18

Similarly, Lopez Palacios is alleged to have several ATD violations, but states that he consistently complied with his requirements. Bloom Decl., ¶ 21; Lopez Palacios Decl., ¶ 7. Further, ICE revoked his release in part based on his travel to California, but Lopez Palacios contends that he was never informed of a travel restriction. Bloom Decl., ¶ 21; Lopez Palacios Decl., ¶ 7. Respondents did not include Lopez Palacios' release conditions and Officer Bloom's declaration does not provide additional information or respond to Lopez Palacios' assertion that he was not instructed of a travel restriction. It thus remains difficult for this Court to substantiate Respondents' post-hoc justifications argued here.

The sole reason that ICE arrested Ramirez Buelvas was because officers encountered him in Anchorage, Alaska, and determined he was living there in violation of his conditions of release. Bloom Decl. ¶ 47. Respondents did not provide the terms of Ramirez Buelvas' release, which Respondents characterize simply as "parole." Dkt. 10 at 7; Bloom Decl., ¶ 46. Nor do Respondents acknowledge or respond to Ramirez Buelvas' contention that he was in Anchorage temporarily visiting his cousin. Thus, the Court is, again, left to rely on Officer Bloom's declaration, which does not shed light on whether Ramirez Buelvas' parole conditions allowed interstate travel or explain how officers determined he was living in Anchorage and why that would have been a violation.

The Court acknowledges that Marcano Marquez was convicted of misdemeanor assault in May 2023, but also observes that his re-detention did not occur until two and a half years later as part of an unrelated ICE operation. Bloom Decl., ¶¶ 37, 39. After his conviction, he asserts that he attempted to contact his ATD case manager multiple times, went to the Portland ICE office on his own volition, and also attended his subsequent biometrics appointment. He submitted his asylum application, applied for employment authorization, and provided ICE with

ORDER GRANTING IN PART WRIT OF HABEAS CORPUS - 19

additional information related to his criminal case.  In June 2025, he went to his brother's ICE appointment to speak with someone about his own case.  While Respondents argue that DHS records do not show that Marcano Marquez had contact with ICE, they do not respond to his declaration explaining his attempts to comply or indicate whether ICE attempted to contact or locate Marcano Marquez during his period of alleged noncompliance.  Instead, Respondents vaguely assert that Marcano Marquez's conviction is a "material change in circumstances" that justifies his detention.  *See* Dkt. 10 at 9.  The Court does not find that a criminal conviction, standing alone, justifies the arrest and re-detention of a noncitizen previously released or disposes of the requirements of due process—particularly when the noncitizen was previously found to not be a danger or flight risk.  *See K.G.M.Q. v. Bondi*, C26-00506-TL, 2026 WL 962609, at *7 (W.D. Wash. April 9, 2026); *Lima Gamez v. Hernandez*, C26-1104-BAT, 2026 WL 1382362, at *6 (W.D. Wash. May 18, 2026); *Doe*, 787 F. Supp. 3d at 1094.  Respondents do not suggest, for example, that Marcano Marquez's conviction demonstrates he is a flight risk or a danger to the community.  Nor do they argue that his conviction *requires* his arrest and re-detention.  *See* 8 U.S.C. § 1226(c) (mandating detention of noncitizens charged with, arrested for, convicted of, or who admit to committing certain offenses).  In other words, Respondents have not adequately explained why Marcano Marquez's conviction was a material change in circumstances that required his arrest and redetention without pre-deprivation process.

Finally, ICE re-detained Sacko based on alleged ISAP violations and his Multnomah County arrest.  Bloom Decl. ¶ 56.  Neither Respondents' return memorandum, nor Officer Bloom's declaration provide Sacko's release conditions, explain the alleged violations, or respond to Sacko's contention that the reason he had contact with law enforcement (which, again, appears to be one reason offered for his re-detention here) was because he was the *victim*

ORDER GRANTING IN PART WRIT OF HABEAS
CORPUS - 20

of a crime.  Nor do Respondents acknowledge the fact that criminal charges were not filed, despite it being documented in Sacko's immigration file provided by Respondents.  *See* Lambert Decl., ¶ 6, Ex. J at 3.  On the current record, and without any explanation offered by Respondents, Sacko's arrest and redetention appears to be erroneous.

The limited procedures used to arrest and re-detain Petitioners, the circumstances under which they arose, the lack of corroborating documentation, and Respondents' failure to acknowledge, explain, or refute Petitioners' version of events demonstrate both the high risk of erroneous deprivation of Petitioners' liberty interests and the probable value in additional safeguards.  Providing notice and an opportunity for Petitioners to challenge the factual basis for their re-detentions would have reduced the risk of an erroneous deprivation of their liberty interests.  The second *Mathews* factor therefore weighs in Petitioners' favor.

### 3. Governmental Interest

Respondents do not meaningfully engage with the third *Mathews* factor or identify any governmental interest being advanced by each Petitioners' re-detention.  Nor do Respondents explain why Petitioners' arrests and re-detentions necessitated effectively no process.  At most, Respondents argue that Marcano Marquez and Sacko's post-release arrests were material changes.  Dkt. 10 at 9.  As noted above, however, Respondents do not explain what makes Marcano Marquez's conviction so material that effectively bypassing any pre-deprivation process was necessary to advance a governmental interest.  And Sacko's arrest appears to be governmental error.  Respondents do not advance any governmental interest related to the remaining three Petitioners.

The Government has an interest in enforcing immigration laws and securing removal of noncitizens.  *Rodriguez Diaz*, 53 F.4th at 1208.  Respondents also have an interest in ensuring a

ORDER GRANTING IN PART WRIT OF HABEAS
CORPUS - 21

noncitizen appears at future immigration proceedings and that a noncitizen does not pose a danger to the community. *Zadvydas,* 533 U.S. at 690. Respondents do not assert any of those interests here. Regardless, those interests would not have been hindered by providing Petitioners with individualized pre-deprivation process. While providing a hearing before re-detaining an individual would require expending resources (money and time), such costs are outweighed by the risk of erroneously depriving an individual of a significant liberty interest. *See*, *e.g.*, *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 970 (N.D. Cal. 2019) ("If the government wishes to re-arrest Ortega at any point, it has the power to take steps toward doing so; but its interest in doing so without a hearing is low.").

Here, ICE was previously persuaded that each Petitioner posed limited risk of absconding and was not a danger to the community. And despite each Petitioner's largely compliant post-release behavior, they were arrested as if exigency demanded their immediate detention. The fact that Respondents concede that three of the five Petitioners were entitled to pre-deprivation process and otherwise fail to identify the governmental interest that necessitated circumventing due process for the remaining two, serves to highlight the value of additional, pre-deprivation safeguards.

In sum, the *Mathews* factors weigh in Petitioners' favor. Given the lack of lawful process at the outset of detention and the absence of exigent circumstances, release is the appropriate and constitutionally required remedy. This conclusion aligns with a broad consensus among district courts. *See*, *e.g.*, *Rojas v. Almodovar*, 2025 WL 3034183, at *8 (S.D.N.Y. Oct. 30, 2025) (holding that where "detention was invalid at its inception[,]" petitioner is "entitled to release."); *E.A. T.-B.*, 795 F. Supp. 3d at 1324; *J.Y.L.C. v. Bostock*, 2025 WL 3169865, at *2 (D. Or. Nov. 12, 2025); *Zhu v. Genalo*, 798 F. Supp. 3d 400, 415 (S.D.N.Y. 2025).

## C.      Remaining Claims and Requests for Relief

Petitioners point to numerous cases from this District that have granted forward-looking injunctive relief related to re-detention.  *See* Dkt. 1 at 25 (and the Western District cases cited therein).  Petitioners argue similar relief is warranted because they "will remain subject to similar conditions and are likely to face arbitrary re-detention again." *Id.* at 26.  Respondents point to this Court's decision in *Aucatoma* and argue Petitioners have not established a "specific, real, and immediate threat" that they will be re-detained without process after release.  Dkt. 10 at 2 (citing *Aucatoma v. Hernandez*, C26-1253-SKV, 2026 WL 1265541, at *9 (W.D. Wash. May 8, 2026).

A party "seeking a permanent injunction must demonstrate (1) that he has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2008).  A permanent injunction requires a "cognizable danger of recurrent violation," not just a past violation. *Cummings v. Connell*, 316 F.3d 886, 897 (9th Cir. 2003).

Petitioners here seek to avoid this Court's denial of similar injunctive relief in *Aucatoma* by pointing to the recency of Cardenas Medina and Ramirez Buelvas' April 2026 detentions as indicative of future imminent harm.  Dkt. 13 at 11.  Their recent arrests, according to Petitioners, demonstrate that the threat of re-detention without due process is "specific, real, and immediate." *See id*. (citing *Aucatoma*, 2026 WL 1265541, at *9).  The Court does not find this argument persuasive.

ORDER GRANTING IN PART WRIT OF HABEAS
CORPUS - 23

First, there is no apparent connection between the timing of a noncitizen's past arrest and the likelihood of their future re-detention. In other words, the fact that Cardenas Medina and Ramirez Buelvas were the most recent to be arrested out of the other Petitioners does not necessarily mean they are more susceptible to future re-detention. Moreover, the petition fails to explain why the timing of Cardenas Medina and Ramirez Buelvas' arrests are relevant to the purported risk faced by the remaining Petitioners. While there may be circumstances where evidence adduced is representative for similarly situated noncitizens, Petitioners here share little in common beyond the fact that they were released and subsequently re-detained without process. They come from largely different backgrounds, entered the United States at different times and different locations, were released on different terms, and lived in different places. Thus, without more, the Court does not find that Petitioners have demonstrated that they face a cognizable danger of future unlawful re-detention after their release based merely on the temporal proximity of their current detentions. Their request for injunctive relief is therefore denied.

Finally, Petitioners also seek the return of their personal property upon release, including personal identification documents and employment authorization documents. Dkt. 1 at 29. Petitioners do not provide factual support or any argument related to this request in their petition. *See generally* Dkt. 1. The Court does not have an independent reason to believe NWIPC will impermissibly retain Petitioners' property. This request is therefore denied.

## IV.    CONCLUSION

For the foregoing reasons, the Court GRANTS the habeas petition (Dkt. 1) in part and ORDERS that:

ORDER GRANTING IN PART WRIT OF HABEAS
CORPUS - 24

(1) Petitioners be RELEASED from immigration detention within 24 hours, subject to reasonable conditions of release in compliance with federal law and regulations;

(2) Respondents shall file notice with the Court within 48 hours that Petitioners have been released;

(3) Remaining requests for relief are DENIED; and

(4) Any fee petition shall be filed within the deadlines set by the Equal Access to Justice Act, 28 U.S.C. § 2412.

Dated this 5th day of June, 2026.

S. KATE VAUGHAN
United States Magistrate Judge

ORDER GRANTING IN PART WRIT OF HABEAS
CORPUS - 25